USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/25/2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
JAMES ANDERSON, :
:
                            Plaintiff, :       16-CV-6012 (JMF)
:
            -v- :       OPINION AND ORDER
:
UNION CITY MIRROR & TABLE CO., INC. et al., :
:
                            Defendants. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      In this action, Plaintiff James Anderson, as Trustee of the Local 966 Pension Fund (the "Fund"), seeks to recover for withdrawal liability that Union City Mirror & Table Co., Inc. ("UCM") incurred pursuant to the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* On January 18, 2018, on the eve of a bench trial, UCM and a series of limited liability companies controlled by the owners of UCM (the "UCM LLCs") consented to entry of judgment on the Fund's claims against them. (Docket No. 119). Accordingly, the one-day bench trial, held on January 22, 2018, was limited to the Fund's claim that the sole remaining Defendant, Russo Realty Corp. ("Russo Realty"), is an alter ego of UCM and, thus, jointly and severally liable for UCM's withdrawal liability. In this Opinion and Order, the Court provides its findings of fact and conclusions of law. For reasons that Court will explain, the Court holds that the evidence is insufficient to treat Russo Realty as UCM's alter ego for purposes of the Fund's withdrawal liability claim.

**BACKGROUND**

Based on the evidence and testimony presented at trial, the Court makes the following findings of fact by way of background. The Court begins with facts that are largely undisputed. The Court includes additional factual findings in the context of the legal analysis below.

UCM, a New Jersey corporation, was formerly a manufacturer, importer, and seller of furniture. (Docket No. 102 ("JPTO"), ¶¶ 67, 68). Until 2008, UCM also owned several residential buildings in the vicinity of its manufacturing facility. (*Id.* ¶ 68). UCM was wholly owned, before 2004, by Generoso Russo. (Trial Tr. 48-49). Pursuant to a stock purchase agreement executed on October 1, 2004, Thomas and Gene Russo — Generoso's adopted sons — each became 50% owners of the company. (Docket No. 110 ("Jennik Decl."), Ex. E ("Gene Russo Dir."), at ¶ 12). Under the agreement, however, Generoso remained Chairman of UCM's Board and continued to perform some functions at the company. (JPTO ¶ 69). In 2008, Thomas and Gene Russo formed several real estate LLCS (the "UCM LLCs") to assume ownership of some of the buildings owned by UCM. (*Id.* ¶¶ 70-71).

Between 2004 and 2010, UCM's business changed: By 2008, UCM stopped manufacturing furniture, although it continued to import furniture. (Trial Tr. 105-06). In 2010, a fire at UCM's facility harmed the furniture manufacturing business. (*Id.* at 129). That same year, Generoso Russo resigned from UCM, and, a year later, filed suit against UCM and his two sons to recover money that Generoso claimed was owed to him. (Trial Tr. 78; Gene Russo Dir. ¶ 26). Generoso Russo died in September 2014; a few weeks later, UCM filed for Chapter 11 bankruptcy. (Gene Russo Dir. ¶¶ 29, 32). While it was in operation, UCM was party to several successive collective bargaining agreements with Teamsters Local 966, covering a unit of UCM

employees, under which UCM was obligated to make contributions to the Fund. (JPTO ¶ 58). UCM ceased contributing to the Fund on October 31, 2014. (*Id.* ¶ 63).

Russo Realty, a New Jersey corporation, was founded in 1979. (*Id.* ¶ 76). Until his death in 2014, Generoso Russo was always the sole owner and president of Russo Realty. (*Id.* ¶ 79; DTX 11 ("Leanza Aff.") ¶ 23). The corporation owned residential properties in the vicinity of UCM's manufacturing facility. (*Id.* ¶ 6). Russo Realty sold all of its properties to an unrelated investor in 2016. (*Id.* ¶ 24).

**DISCUSSION**

The Second Circuit summarized the relevant standards for determining alter ego liability in the ERISA context in *Retirement Plan of UNITE HERE National Retirement Fund v. Kombassan Holding A.S.*, 629 F.3d 282 (2d Cir. 2010).[1] As the Court explained, "[d]etermining that an entity is an alter ego 'signifies that, for all relevant purposes, the non-signatory is legally equivalent to the signatory and is itself a party to the [collective bargaining agreement].'" *Id.* at 288 (quoting *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004)). The purpose of the doctrine "is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Id.* (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL–CIO v. NLRB*, 261 F.3d 291, 298 (2d Cir. 2001)); *see also Bd. of Trustees of the Heat & Frost Insulators Local No. 33 Pension Fund v. D & N Insulation Co.*, No. 3:11-CV-01998 (JAM), 2015 WL 5121458, at *5 (D. Conn. Aug. 31, 2015) (finding that alter ego liability is typically warranted where "an employer who owes withdrawal liability pursuant

---

[1] In pretrial submissions, Russo Realty invoked New York alter ego and veil-piercing law. (*See* Docket No. 104, at 7-12; Docket No. 111, at 3). Counsel for Russo Realty later conceded, however, that federal law provides the applicable standards. (*See* Trial Tr. 174-75).

3

to ERISA will attempt to evade this obligation by establishing a parallel or successor entity"). "To protect employee benefits, courts observe 'a general federal policy of piercing the corporate veil when necessary.'" *Kombassan Holding*, 629 F.3d at 288 (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005)).

More specifically, "'[t]he test of alter ego status is flexible,' allowing courts to 'weigh the circumstances of the individual case,' while recognizing that the following factors are important: 'whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.'" *Id.* (quoting *Goodman Piping Prods., Inc. v. NLRB*, 741 F.2d 10, 11 (2d Cir. 1984)); *accord Lihli Fashions Corp. v. NLRB*, 80 F.3d 743, 748 (2d Cir. 1996). Another factor, which can be a "sufficient basis" in and of itself "for imposing alter ego status," is "an 'anti-union animus or an intent to evade union obligations.'" *Kombassan Holding*, 629 F.3d at 288 (quoting *Goodman Piping Prods.*, 741 F.2d at 12). At the same time, anti-union animus or intent to evade — that is, bad faith — "is not a *necessary* factor." *Id.* Ultimately, all of the factors need not be present "to establish that two entities are alter egos, and no single factor is dispositive." *Moore v. Navillus Tile, Inc.*, No. 14-CV-8326 (CM), 2017 WL 6388962, at *28 (S.D.N.Y. Sept. 20, 2017).

Applying the *Kombassan Holding* factors here, the Court concludes that there is no basis to treat Russo Realty as UCM's alter ego for purposes of ERISA liability. For one thing, the Fund wisely concedes that there is no evidence that UCM and Russo Realty had overlapping customers and no evidence that UCM (or any of the Russos) acted in bad faith. (*See* Trial Tr. 179-81). For another, the Fund's contention that UCM and Russo Realty share substantially identical management and ownership rests primarily, if not exclusively, on the fact that there was a close familial relationship between the Russo brothers and their father. (Trial Tr. 181; *see also*

4

Docket No. 103, ¶ 25). There is reason, however, to question how "close" the familial relationship at issue here really was: Generoso Russo resigned from UCM in 2010 because he was allegedly not being paid by his sons and he sued his sons in 2011.[2] But regardless, a close familial relationship creates a presumption of alter ego status only where "all evidence point[s] toward an alter ego finding except the fact that the companies [are] not owned by the same people." *In Matter of Staying Arbitration & Vacating Notice of Intention to Arbitrate Between Armen Digital Graphics, Ltd., Amalgamated Lithographers of Am., Local One* ("*Armen Digital*"), No. 96-CV-5844 (LBS), 1997 WL 458738, at *7 (S.D.N.Y. Aug. 12, 1997). In such circumstances, courts "use[] the fact that the owners [are] members of the same immediate family and the companies closely held as a proxy for identical ownership." *Id.* Where the other relevant factors do not point toward alter ego liability, however, there is no basis to "imput[e] common ownership to close family members." *Id.* Indeed, were it otherwise, "families would be effectively precluded from organizing their business affairs in any but a single corporate entity. Children would be barred from creating companies distinct from those owned by their parents" or, as here, assuming only partial ownership of a parent's holdings. *Id.* at *7 n.9. "The alter ego doctrine does not compel these results." *Id.*

---

[2] There was, to put it mildly, some tension between the testimony of Gene Russo and the testimony of Thomas Russo with respect to the effect of the 2011 lawsuit on their relationship with their father. Thomas Russo testified that "there was no ill will due to the fact that [Generoso] had sued [him]" and that the sons "were good with [their] father" even after he sued them. (Trial Tr. 83-84). By contrast, Gene Russo testified that, as a result of the lawsuit, the relationship between the Russo sons and their failure "was terrible." (Trial Tr. 137). The Court found Gene Russo's testimony to be more credible. Whether the brothers viewed their stepmother as the driving force behind the lawsuit or not, it is hard to imagine that the lawsuit — which was clearly not collusive and was brought in good faith (*see* Trial Tr. 153-55; Leanza Aff.. ¶ 13-14 (describing Leanza's role, as Generoso Russo's lawyer, in advising Generoso Russo on his suit against Gene and Thomas Russo)) — did not have an adverse effect on the relationship between the Russo brothers and their father.

The Court need not decide whether, if they weighed in the Fund's favor, the other four *Kombassan Holding* factors — business purpose, operations, equipment, and supervision — could alone support a finding of alter ego liability. That is because the factors weigh either against the Fund or only weakly in favor of the Fund. First, Russo Realty and UCM did not share a common business purpose. The core business of UCM revolved around furniture: its manufacture, import, and distribution. (*See* Trial Tr. 127-28). By contrast, the core — in fact, sole — business of Russo Realty was the ownership and management of residential properties. (JPTO ¶ 78). Admittedly, owing to a host of factors (the 2010 fire, competition from cheaper imports, the attacks of September 11, 2001), UCM began, in its waning days, to derive more income from its real estate holdings than from the furniture business. (*See* Trial Tr. 129). But the mere fact that the company's main revenue stream was slowing to a trickle does not change the fact that the company's main "purpose" was furniture-related. Notably, UCM began pursuing real estate interests primarily to ease the burden on its manufacturing facility — further underscoring that furniture was at the core of UCM's business. (*See id.* at 35-36). Because owning real estate and manufacturing furniture are distinctly different business purposes, the Court finds that this factor weighs against the Fund.

Second, UCM's and Russo Realty's operations did not substantially overlap. The companies managed separate buildings and largely respected corporate form by, among other things, filing separate tax returns and maintaining separate financial accounts. (*See id.* at 85, 113-14, 171-72). To be sure, there was some overlap in the companies' operations: one or two employees did work for both corporations (*see id.* at 157), and Russo Realty tenants sometimes paid their rent at the UCM office (*see id.* at 63-64). But these elements were *de minimus* — Russo Realty tenants, who lived down the street from the UCM office, often paid their rent on

6

the street when they saw a Russo family member available to collect rent. (*See id.* at 61). Such favors to a family do not amount to common operations. Nor does the Court put much stock in Generoso's use of his UCM office to conduct Russo Realty business. There was no evidence that Generoso kept Russo Realty business files there; the only evidence on this point was that Russo Realty files were kept in Generoso's briefcase or at his lawyer's office. (*Id.* at 145). And the Fund produced no evidence that Generoso significantly relied on UCM's telephone, fax, and secretarial help in running Russo Realty. (*See id.* at 112). In short, considered as a whole, the relationship between UCM's and Russo Realty's operations was not so overwhelmingly intermingled as to warrant alter ego liability. *Cf., e.g.*, *Trustees of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 342 (E.D.N.Y. 2017) (finding this factor satisfied where the original entity "had at least some control over [the alleged alter ego]'s bank account" and where "checks from customers made out to [one entity] were deposited into the other's account").

Third, UCM and Russo Realty did not share significant amounts of equipment. Aside from office space at UCM, which Generoso used on occasion to conduct Russo Realty business, the only "equipment" that UCM and Russo Realty are alleged to have both used is a few stray tools and some wood. (Trial Tr. 93-94, 115). This is too slim a reed on which to find alter ego liability. *Cf., e.g.*, *Moore*, 2016 WL 750797, at *4 (finding shared equipment provided some evidence of alter ego status where the alleged alter ego entity used "expensive pieces of equipment," including a "tower crane on two major projects").

Finally, UCM and Russo Realty did not have substantially identical supervision. After 2010, Thomas and Gene Russo managed and supervised UCM's operations. Admittedly, between 2004 and 2010, there was certainly some overlap in the person of Generoso. But, as

7

noted, he resigned as a UCM employee (if not as an officer and director) in 2010, and he had relatively little involvement in the company after the 2010 fire. (Trial Tr. 101-03). Notably, the 2010-2014 period is the very same time period upon which the Fund relies to contend that UCM and Russo Realty shared a business purpose in real estate. The Fund, however, cites no authority for the proposition that a court may cherry pick evidence from different periods of time in the life of a corporate entity to find that the different *Kombassan Holding* factors are satisfied.[3] Indeed, to do so would be fundamentally unfair: Companies would have no notice of how they could organize themselves to avoid alter ego liability; nor would they have any incentive to disentangle themselves from any alter egos. *Cf., e.g.*, *Bd. of Trustees of Plumbers, Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, No. 1:13-CV-004 (MRB), 2017 WL 1177505, at *6 (S.D. Ohio Mar. 30, 2017) (rejecting an argument that once a company is found to be the alter ego of other companies, "it is forever their alter ego, regardless whether the companies' identities almost entirely diverged as time went on"); *Moore*, 2017 WL 6388962, at *33 (finding that the alleged alter egos had "sufficiently disentangled their businesses from [the original entity] such that they ceased being its alter egos").[4]

---

[3] There is a strong argument that the relevant time period, for purposes of assessing whether alter ego liability is appropriate, is when UCM's withdrawal liability was triggered in 2014, as that is when the company's liability was incurred. But the Court need not, and does not, decide that issue because, whether the Court considers evidence only from that particular moment or spanning a longer period of time, the facts would still not support alter ego liability.

[4] In post-trial briefing, Anderson suggests that the facts of this case are similar to the facts of *Kombassan Holding*, in which the Second Circuit found alter ego liability. (*See* Docket No. 121). It is true that this case and *Kombassan Holding* involved corporate splits long before withdrawal liability was triggered. But that is where the similarities between the two cases end. Most notably, in *Kombassan Holding*, the alter ego entity regularly held itself out as the owner and controller of the employer. *See* 629 F.3d at 289. By contrast, Russo Realty never held itself out as (and, in practice, was not) the owner or controller of UCM.

In the final analysis, the evidence in support of alter ego liability here is even weaker than it was in cases where courts have found it insufficient. *See, e.g.*, *Armen Digital*, 1997 WL 458738; *Finkel v. S.I. Assocs. Co.*, No. 05-CV-4656 (LDW), 2008 WL 2630297, at *13-14 (E.D.N.Y. June 30, 2008) (rejecting alter ego liability where the two entities were separately owned by brothers, where they were both in the concrete business, and where one entity exhibited anti-union animus). Judge Sand's decision in *Armen* is particularly instructive. There, the pension fund plaintiff claimed that a "traditional prepress" business and an "electronic prepress" business were alter egos. 1997 WL 458738, at *3. The two companies shared office space, a bookkeeper, fax machines, copiers, computers, and customers. *Id.* at *4. Most notably, the alleged alter ego entity was wholly owned by the son of the sole owner of the other entity and had accepted "forgiveable loans" from the other entity. *Id.* at *1, 5. Nevertheless, the Court held that "the operations, business purposes, management, supervision, equipment, and customer bases of Graphics and Digital are too distinct to suggest alter ego status." *Id.* at *7. If those facts are insufficient to support a finding of alter ego liability, then the facts of this case — which are considerably weaker — are plainly insufficient.

## CONCLUSION

For the reasons stated above, the Court concludes that Russo Realty is not UCM's alter ego. Accordingly, the Clerk of Court is directed to enter judgment in favor of Russo Realty.

With respect to the Fund's claims against UCM and the UCM LLCs, the Fund shall submit a proposed judgment consistent with the Court's endorsement **within one week of this Opinion and Order**. Further, the Fund shall confer with counsel for UCM and the UCM LLCs in an effort to reach agreement on attorney's fees and costs. Absent an agreement, the Fund shall file an application for attorney's fees, supported by contemporaneous billing records, **within one**

**month of the date of this Opinion and Order**; any opposition to such an application shall be filed **within two weeks of the application**; and any reply shall be filed **within one week of any opposition**.

The Clerk of Court is directed to close this case.

SO ORDERED.

Date: January 25, 2018
New York, New York

_____
JESSE M. FURMAN
United States District Judge